53 So.2d 182 (1951)
PRICE
v.
T. L. JAMES & CO., Inc., et al.
No. 7668.
Court of Appeal of Louisiana, Second Circuit.
May 30, 1951.
Camden K. Staples, Alexandria, for appellant.
Gravel & Downs, Alexandria, for appellees.
TALIAFERRO, Judge.
Plaintiff alleged that while performing the duties of a contract of hiring with T. L. James & Company, Inc., of Ruston, Louisiana, on the 26th day of July, 1949, he sustained injuries of such nature as to create permanent total disability to perform work of a reasonable character. He was not, in reality, an employee of the T. L. James & Company, Inc., but of S. T. Wall, sub-contractor of that company. The variance is not of material consequences; in fact, the point is not seriously urged.
If plaintiff is entitled to compensation from Wall, likewise he could recover from the company. Section 6, Act 20 of 1914, as amended, LSA-RS 23:1061 to 23:1063.
T. L. James & Company, Inc., and the carrier of its compensation insurance, National Surety Corporation of New York, are defendants in the action. Compensation at the rate of $30.00 per week for four hundred (400) weeks is sought.
Plaintiff for a cause of action alleged that while attempting, with his hands, to lift the left end of a sod plow in order to attach it by bolts to a tractor, he "felt a searing or tearing" pain in his back on the right side, at about the height of his hip bone, and in front of his right side at about the same height; and that said injuries consist of: (1) a severe sacro-iliac strain, right side; (2) weakening of the right abdominal wall in the right front at the inguinal ring; (3) severely aggravated arthritic condition of the lumbar spine.
He further alleged that the sod plow weighed between 350 and 500 pounds; that he was an assistant foreman under a man named William H. Barnes, a foreman; that thinking his injuries to be not serious, *183 he continued to work for a few days but the pain from said injuries grew steadily worse, so much so that on August 8th he made known his condition to said Barnes, who directed him to report to the company office; that the superintendent sent him to Dr. Lawrence in Colfax, Louisiana, who, after a brief examination, told him to report to the Baptist Hospital in Alexandria, Louisiana, and he did so on that day.
Defendants deny that plaintiff received any injuries while in the employ of T. L. James & Company, Inc., on July 26, 1949, or on any other day; and, in the alternative, if he was injured, as and when alleged by him, such injuries did not disable him to perform the type of work he was performing prior to, on or about said date; that if he suffers disability of any character, such is the result of his own physical condition prior to said date and it is not related to trauma or accident sustained as by him alleged.
Plaintiff was awarded judgment for compensation at the rate for which he sued, for a period of thirty (30) weeks.
On January 30, 1951, plaintiff perfected appeal by filing bond therefor.
On January 13, 1950, defendants paid the judgment in full, including costs. In this Court, answering the appeal, the appellees, after reciting the fact of such payment, averred that it was done "without in any manner acknowledging the correctness of said judgment". They pray that the judgment be reversed and that they be awarded judgment against plaintiff, appellant, for the amount of said payment.
The Lower Court supported its judgment by an extended discussion of the pertinent facts of the case and an analysis of the testimony of the half dozen doctors who appeared as witnesses on behalf of one side or other.
Plaintiff's designation was "sod field foreman". He was also referred to as "gang pusher", because he was in charge of and supervised the work of a crew of men, ranging from fifteen to twenty-five. His employment did not require that he perform manual labor, although at times, voluntarily, he may have done or assisted in doing odd jobs that entailed physical effort, for a few minutes, that were not comprehended within his regular duties.
At the time and place he claims to have injured his back, there were but two persons present, he and William H. Barnes, who had charge of the tractor to which the sod plow was being attached. Barnes did not "notice him straining or doing any amount of over-exertion" at the time, but admits that immediately after the plow was attached to the tractor, plaintiff stated that he "snagged a crick in his back". All of the doctors, including Dr. Banks, orthopedic surgeon at the Baptist Hospital in Alexandria, who first examined him, agree that he had suffered an injury to the lower portion of his back. On this question, although to some extent plaintiff's own action for several days thereafter does not entirely comport with the position he subsequently asserted and now asserts, we find that there was an accident out of which he did receive some injury to the lower part of his back.
Plaintiff continued to perform his duties as foreman until August 3rd, without complaining to his superiors that he had had a serious accident eight days prior. He says he quit work on his own accord, as he could not do the "hard work" he had been doing, while Mr. Wall is positive he discharged him, and the reason therefor appears to have been due to his inability to get along with some colored workmen of his crew.
As to the reason he quit working for Wall, or was discharged, plaintiff, in written statement given the adjuster on August 13, 1949, said: "I met Mr. Wall in Colfax, Louisiana, and had a lengthy discussion concerning some troubles between the laborers and myselfresigning at that time. I had no other reason for resigning my job, only labor troubles."
We believe this statement to reflect the truth. Disagreement between plaintiff and members of his crew, and not his inability physically to lead them, as he says, necessitated a change in leadership.
On August 8th, five days after his discharge, he reported to Barnes that he had *184 hurt his back and desired to consult a physician. Barnes carried him to the office of the company, and he was there directed to see Dr. Lawrence in Pollock. After a cursory examination, Dr. Lawrence directed that he be carried to the Baptist Hospital in Alexandria, and this was promptly done.
Dr. Banks took from plaintiff the case history, and he, inter alia, stated that "he had been unable to work since that (July 26th) time because of his back paining him, and that bed rest at home had not relieved him." He did not appear acutely ill, and when asked the location of the pain he asserted, pointed to the right side of his back, at about the level of the fifth lumbar vertebra. He then had limitation of forward bending of the back, and muscle spasm on its lower rights side; there was pain when he raised the right leg extended. In all other respects the examination revealed no abnormal pathology. Clinically, Dr. Banks thought plaintiff had had a low back strain "which was not too severe". X-ray pictures revealed "a good bit of spurring of all of the lumbar vertebrae and some roughening of the joint spaces." This he attributed to long existing arthritis of chronic character. There was no X-ray evidence of recent injury; that is, within the period of at least three months. Appropriate treatment was administered.
The patient was hospitalized for four days, at the expiration of which the muscle spasm had practically disappeared. Dr. Banks felt that with proper support to the back his symptoms would very likely clear up in six to eight weeks. A lumbo-sacral support was ordered. It was sent to plaintiff by mail. He was not specifically told to bring it in for proper adjustment, as Dr. Banks assumed that he would follow the custom of having his local physician (at Pollock) do this, but this was not done. However, the support was worn, but it was, thereafter, found to be not properly in place, and, therefore, the maximum of benefit had not accrued.
Dr. Banks again examined plaintiff on February 14th, some six and one-half months subsequent to the alleged accident. He was then complaining of continuous pain of the lower back region, stating it was the same pain he had had since date of the accident. Thorough physical examination and various tests convinced the doctor that the profession of pain was largely, if not entirely, without foundation. One inaccuracy in locating the pain impressed Dr. Banks, as it does us. When asked to put his finger on the spot from whence the pain emanated, he would do so, and after the lapse of a few minutes when asked to repeat it, he would locate it one and one-half to two inches from the first location. The doctor, on this point, says: "Therefore, I figured that his tenderness was not very acute if he couldn't localize it any better than that."
Dr. Banks was unable to link the evidence of arthritis with plaintiff's professions of pain. He could not say that the arthritis had been aggravated by the injury to the sacral-lumbo ligaments. The joint is at the lower end of the spinal column, between the lowest of the lumbar vertebrae and the sacrum. The evidence of arthritis was above that joint.
Dr. Banks was of the definite opinion that plaintiff, when last examined by him, was physically able to perform the supervisory work he was performing when injured. Dr. Banks also gave the following testimony, viz.:
"Q. Doctor, have you had occasion to see Joe Price within the last week or 10 days? A. I saw him on the streets in Alexandria.
"Q. Do you recall when, Doctor? A. It was either Thursday or Friday of last week.
"Q. When you observed him, did he appear to be in any kind of pain or discomfort on walking? A. He was walking along the streets. I watched him for about a couple of blocks. I watched him step off curbs and step on other curbs and walk across the streets, and he walked pretty straight.
"Q. He walks differently from the way he walks in the courtroom? A. Yes, sir."
Dr. Daniel M. Kingsley of Alexandria, who specializes in orthopedic surgery, and has had an unusually varied and extensive training and experience in this line of *185 surgery, examined plaintiff closely on October 15, 1949. He told Dr. Kingsley that in addition to the back symptoms related to Dr. Banks, at time of the accident he felt a "stinging pain in the front, in the area where people usually have ruptures". There was no connection between the two pains.
We interpolate here that the allegation about the "weakening of the abdominal wall", etc. as an element of injury, obviously has been abandoned. Not one of the examining physicians looked for it, and to not one of them did plaintiff attribute the pain, in whole or part, to the alleged possibility of rupture about the inguinal ring.
Dr. Kingsley subjected plaintiff to every known test to determine if he was really suffering the disabling pains of which he complained. His diagnosis of the injury and its disappearance tallies with that of Dr. Banks. The following testimony of Dr. Kingsley is especially enlightening, viz.:
"When he bends forward with his knees stiff in standing position, his finger tips came within 10 inches of the floor. When he stood in the same position and bent to the right side, he did not go very far, only 10 degree of the arc of the circle. When he went to the left side, he developed that range of motion. Backward bending was also only 10 degrees.
"However, when he did not realize what was being done and I tested the bending of his spine, I got a very complete range of motion. For example, when he was sitting I asked him to bend over and touch his toes, and his finger tips never went to the same place twice because he was impressing me so strongly of his disability. He wished to make sure that I knew how badly he was suffering. When he took off his clothes and put them on again, he exhibited a range of motion which he told me just a few minutes later he could not possibly do because he could not stand the pain. Then a few minutes later when he put his clothes on, again he put his back through range of motion which he refused to do when he was sitting because he could not stand the pain. There was a slight restriction of motion which was not normal."
He emphasized the point that had the arthritic condition of the lumbar vertebrae been aggravated by the accident, the X-rays taken two months thereafter would have disclosed changes from those disclosed by the pictures taken on August 8th, and he is sure no such changes are revealed.
Dr. Kingsley added that during his two and one-half years practice in Alexandria, only three cases of sacro-iliac sprains had come to him, and "they were all mighty sick people". He was definitely of the opinion that physical effort, such as plaintiff says he put forth in raising the plow, would not produce a sacro-iliac strain. He supports this conclusion by adding that had either of the sacro-iliac joints been strained, plaintiff could not possibly have continued in his regular work for over a week; that the attending pain would have been so excruciating as to make this impossible. He also testified that injuries to the sacro-lumbo joint are often mistaken for strain of the sacro-iliac joint; and we do not doubt this in the least. Dr. Kingsley was clearly of the opinion that plaintiff on October 15, 1949, could resume his work as foreman of a working crew.
Dr. P. M. Davis, orthopedic surgeon, associated with Dr. Banks, also examined plaintiff closely on March 24, 1950, four days before the last day of the trial. His findings and conclusions agree with those of Drs. Banks and Kingsley.
Dr. David Salmon, head of the X-ray Department of the St. Francis Hospital in Alexandria examined and interpreted all of the X-ray pictures, plaintiff's and defendants', introduced in evidence. He found that the pictures disclose evidence of chronic arthritis of the lower vertebrae, a condition not unusual in a man of plaintiff's age, fifty-three years. Beyond this the pictures disclosed no bone pathology.
Plaintiff consulted Dr. Blanchard H. Texada, a general practitioner in the City of Alexandria, twice in September, 1949. Besides physical examination, X-ray pictures were made of the lower portion of *186 the back and the sacro-iliac region. The diagnosis was sacro-iliac strain and chronic osteo-arthritis of the spine of the hypertrophic type. No treatment was administered. He was advised to continue wearing the support Dr. Banks had sent him, until his back pains were relieved. The diagnosis was based upon manipulation and the patient's statements regarding the pain and its location, as the X-ray does not reveal trauma of the ligaments, muscles, tissue, etc.
Dr. Texada would not give opinion that if plaintiff felt the pains he professed, they were due to injury of the sacro-iliac joint or to activation of pre-existing arthritis. He added that a strain of the character mentioned, ordinarily "does not last that long; they generally move in from six to ten weeks". However, he would not say the pains, if they existed, did not emanate from the joint. He was of the opinion that lifting a very heavy object could produce the strain he found, and that the symptoms complained of by plaintiff could be the result of it; that the presence of arthritis generally was without significance because most persons, past fifty years old, are affected with it to some extent, at least.
On the whole, Dr. Texada's opinions are indefinite save for the character of strain. Not being a specialist in orthopedic surgery, naturally his opinion on this point does not carry the probative weight as do those of doctors so trained and experienced.
Dr. E. H. Magee, presently of the staff of the Louisiana State Central Hospital in Pineville, Louisiana, specializing in nerve and mental cases, examined plaintiff in his apartment near the hospital grounds a week prior to trial, and reached the conclusion that "he had some definite pathology in the area of the lumbo-sacral and sacroiliac, which are close together."
The testimony of Dr. Magee, in a general way, agrees with that of Dr. Texada. He did not believe plaintiff able to do manual labor. What we have said regarding the probative value of Dr. Texada's testimony applies also to Dr. Magee's.
Lay testimony, including that of plaintiff's wife, corroborates his own as concerns inability to do manual labor and profession of pain, which, he says, is relentlessly intense and has continued uninterruptedly since the accident. This, too, in the face of admitted activity in performing his duties for several days after the accident, and in operating his truck regularly to time of trial.
It is also of significance that plaintiff did not inform any of his superiors that he had a disabling injury until after he was discharged as foreman.
Other incidents detract from the weight of his own testimony. To support the profession of weakness of his back and lack of ability to lift objects weighing one hundred pounds and less, he put on two demonstrations in the presence of friends in a store building in the Village of Pollock. Both demonstrations were signal successes. He failed to lift the objects. Surely, we would not have expected him to do so, regardless of ability. They were efforts to prove a negation and, of course, have no value as proof.
In this connection it is pertinent to here state that during several months prior to the trial in March, 1950, plaintiff was well able to and, in fact, did drive his one and one-half ton truck about the country picking up and delivering lumber, pine posts and fire wood to those persons who gave orders therefor. He testified, however, that he could not cut down trees nor convert logs into posts, nor load and unload them on account of the intense pain he would experience from the physical efforts and movements necessary to do so. He says he engaged others to do the work, save drive the truck.
This case is materially different from the average compensation case in that ability to perform manual labor is not the vital issue. Plaintiff was not performing and his employment did not require that he perform this sort of labor. Prior to his engagement with Wall, he had for many years rendered service as foreman to other employers. The record does not affirmatively prove that he ever performed manual labor for a livelihood.
*187 Plaintiff carried the burden of establishing disability to perform the kind of service he was performing when injured. He has failed to prove this allegation. If he is able to direct the making of posts, to direct the loading and unloading of them, as well as fire wood, and lumber, and to operate a truck in this line of work, it follows inescapably that he possesses the ability to "boss" a crew of ordinary laborers.
In fixing plaintiff's disability at six months, the Court evidently reached the conclusion that disability had ceased prior to Dr. Banks' examination on February 14, 1950. We think this term of disability quite liberal to plaintiff and gives to him the benefit of some uncertainty.
For the reasons herein assigned, the judgment from which appealed, is affirmed. Plaintiff is cast for costs incurred in prosecution of this appeal.