80 So.2d 438 (1955)
Charles HENDERSON
v.
NEW AMSTERDAM CASUALTY COMPANY.
No. 20570.
Court of Appeal of Louisiana, Orleans.
May 23, 1955.
Frank S. Bruno, New Orleans, for plaintiff and appellant.
*439 Henriques & Mayo, Harry M. Mayo, Jr., New Orleans, for defendant and appellee.
CURTIS, Judge Ad Hoc.
This is a suit under the Workmen's Compensation Act, LSA-R.S. 23:1021 et seq. Plaintiff Charles Henderson, 48 years old, was employed as an ordinary laborer by Gervais F. Favrot Co., Inc. On February 24, 1954, while so employed he was carrying a sack of cement weighing about 95 pounds. He slipped and twisted his back. He was paid compensation at the rate of $30 per week for 19 5/7ths weeks. Further compensation being denied, Henderson brought suit against the compensation insurer, New Amsterdam Casualty Company, claiming that he was totally and permanently disabled as a result of the accident, and hence entitled to compensation at the rate of $30 per week for a period not to exceed 380 2/7ths weeks, plus medical expenses up to $1,000, or alternatively for such lesser amount as the Court might determine to be due him in accordance with the Workmen's Compensation Laws of Louisiana.
The learned trial judge awarded plaintiff compensation at the rate of $30 per week for an additional 20 weeks, i. e. from July 19, 1954, until Dec. 6, 1954. The Court also allowed an expert witness fee of $50 to Dr. William Fisher.
From this judgment plaintiff has appealed.
The decision in this case depends entirely on medical testimony, and the only point to be determined is whether, as found by the District Court, plaintiff had fully recovered on December 6, 1954, from all of the effects of the accident.
If such is the case, and if plaintiff after that date suffered from any disability which was not the result of the accident, or in any wise connected or associated therewith, he is not entitled to any additional compensation.
We have carefully reviewed the record and agree with the conclusions reached by the trial court.
Plaintiff claims that he suffers pain and is unable to return to work. He stated:
"* * * It feels like my back is giving way on me and those pains feel like they are just pushing against something, I don't know how to express it. It feels like something is pushing together and causing the pain in my back to run down through the left side, through the left side of my hip. * * Down my leg."
Plaintiff produced as his medical expert, Dr. William Fisher, who specializes in internal medicine and surgery. Dr. Fisher only saw the plaintiff on two occasions, the first time on April 8, 1954, and again on September 28, 1954. It must be mentioned here that on Henderson's initial visit to Dr. Fisher he was then undergoing treatment from Drs. Harrison, Lyons, Baker & Paine, defendant's physicians. On the occasion of Henderson's first visit, Dr. Fisher ordered X-rays, which he states showed a narrowing between vertebrae L-2 and L-3, indicating to him only this: that Henderson either had a degenerative process of the spine or had a sudden acute process occur at the site of the narrowing. Dr. Fisher, when asked if it was possible for him to determine whether the narrowing of the vertebrae was caused by the degenerative changes in Henderson's spine or a sudden acute process, answered:
"I believe on a percentage basis you would be more correct most of the time if you would say that it was due to a sudden accident. If you had X-rays prior to the time of injury and the space wasn't narrowed I think that would definitely indicate the accident caused the narrowing of the space."
He was then asked:
"In the absence of X-rays prior to the alleged injury here is it possible for a doctor to determine whether or not the narrowing of the margins was caused through a sudden acute process or through a gradual degenerative process ?"
*440 He replied:
"I don't feel I am in a position to say that I could say that the narrowing that I saw on the X-rays were a result of either acute or a process over a long period of time."
On his second examination on September 28, 1954, Dr. Fisher states that he observed that Henderson had a slight limp of the lower left extremity and complained of pain when he arises from a sitting position or takes long walks. Dr. Fisher's belief at the time was that there was a possibility that Henderson had a ruptured disc. After this second visit, Dr. Fisher made no further examinations of Henderson.
Dr. Charles Lilly, radiologist, who made the X-ray plates for Dr. Fisher, stated that he also noticed the narrowing of the intervertebral spaces between the bodies of two and three lumbar vertebrae with hypertrophic changes about the margins of the bodies. Dr. Lilly was asked if it was possible for him to determine whether the narrowing between the vertebrae was caused by injury or whether it was due to a degenerative process taking place over a period of years. His answer to the question was:
"It is not possible to tell specifically. You have to associate cause and effect. Without the history that is one thing. With the history of the injury then you find these findings particularly at this level, then the assumption would be, my impression would be, that the objective findings could have been due to the injury."
This question was also asked by Dr. Lilly:
"But you say there is no way in which you could determine whether or not this narrowing was caused through a sudden blow or injury ?"
His answer was:
"No."
While Dr. Fisher stated he did not believe that Henderson could return to his former employment, it will be noted that he would not say positively that Henderson's condition was the result of a ruptured intervertebral disc, nor does Dr. Lilly make the positive statement that the narrowing between the vertebrae was so caused.
The evidence shows that after the accident Henderson continued to work for the balance of the day, but on the next day, February 25, 1954, complained of back pains and was sent to the office of Drs. Harrison, Lyons, Baker & Paine, the compensation physicians for the defendant. Plaintiff was accorded treatment by these physicians from February 25, 1954, through July 14, 1954, when he was discharged as cured insofar as the injuries sustained on February 24th were concerned. While plaintiff was under treatment at the office of Drs. Harrison, Lyons, Baker & Paine, he was paid compensation for a period of 19 5/7ths weeks or through July 19, 1954.
During this period Henderson made fifty visits to the physicians' office; he was seen by Dr. Mannie D. Paine on nineteen occasions, by Dr. Baker on ten occasions, and by Dr. Lyons on four occasions, and on seventeen other visits he was given infra-red and diathermy treatments.
Dr. Paine testified that the X-rays of March 12, 1954, which incidentally were the first taken, showed a narrowing of the two vertebrae and hypertrophic arthritis in Henderson's spine, and Dr. Paine's opinion was that these conditions were not attributable to the accident of February 24, 1954, but that the conditions actually predated the accident. When asked on cross examination why it was he instructed Henderson to do only light work when he discharged him, Dr. Paine answered that Henderson was marked by hypertrophic arthritis and that due to the fact that he had remained off from work for a period of four and one-half months, it might possibly be that Henderson could be injured again if he immediately attempted to do his usual heavy duties. Dr. Paine stated that he thought the injury which Henderson sustained had resulted from a twisting motion in the fall, but that the injury itself was not of a serious type and was apparently minimal as Henderson *441 had no bruises or contusions or other external evidence of trauma. However, Dr. Paine admitted that when he discharged Henderson as being able to return to light work, he directed him to return to the office for continued treatment. So far as the record shows, Henderson never returned to the defendant's physicians.
On May 5, 1954, the office of Drs. Harrison, Lyons, Baker & Paine sent Henderson to Dr. O. L. Pollingue, and orthopedic specialist, for examination. Dr. Pollingue, who viewed the X-rays which had been made on March 12, 1954, believed that the patient had sustained a lumbosacral strain which was being aggravated by his bad posture. Dr. Pollingue also believed that there was a possibility of some lumbar disc degeneration and advised Henderson to continue wearing his lumbosacral support. He thought that it would only be a matter of time before Henderson would again injure his back because of the arthritic changes. Dr. Pollingue again saw Henderson on July 2, 1954, and his findings then were that there was some accentuation of the anterior posterior curves of the spine, but that there was no abnormal extension. There was some slight pain over the lumbosacral joint region. Dr. Pollingus felt that Henderson was then able to resume his former occupation but told him that he probably would experience some aches in the lower back for the first three or four weeks on his return to work due to inaction, but that this condition would eventually subside. The doctor was certain there was no residual from the injury and that the hypertrophic arthritic condition predated the accident.
Dr. George C. Battalora, an orthopedic surgeon, examined Henderson on behalf of defendant on December 6, 1954. Dr. Battalora, appearing as a defense witness, stated that his was a complete orthopedic examination of the patient; that he checked his spine and extremities for evidence of disease or limited motion and his finding was that Henderson had completely recovered from the effects of a low back strain which he sustained about February 24, 1954. For the purposes of making his examination, Dr. Battalora had independent X-rays made which showed some "thinning" between vertebrae L-2 and L-3, together with marked hypertrophic changes there. The hypertrophic changes at this level indicated that the spine was being used constantly in a position of strain which is frequently the case with reference to laboring men who have hypertrophic changes and poor posture and subject their backs to constant lifting and straining. Dr. Battalora could see nothing which would prevent Henderson from returning to the normal duties of his occupation.
The trial judge believed that from and after December 6, 1954, Henderson was able to return to his occupation with Gervais F. Favrot Co., Inc., hence limited the compensation award to 20 additional weeks, viz.: from July 19, 1954 to December 6, 1954. This was correct in view of the testimony of Dr. Paine, who stated that when he discharged Henderson on July 14, 1954, he instructed him to do only light work because of the nonuse of his back for the 19 week period. In this connection, Dr. Pollingue's testimony must also be taken into consideration. He stated that while he believed Henderson could return to his employment that Henderson would continue to suffer pains in the back for some time.
We are inclined to the belief that for some weeks after these physicians had last seen Henderson he continued to suffer some pain. We do not think that it was contemplated by the redactors of the compensation law that an injured workman should be compelled to return to his work while still suffering pain resulting from injuries received in an accident. It has been said by the Supreme Court in Stieffel v. Valentine Sugars, Inc., 188 La. 1091, 179 So. 6, 15, "`"Competency," accompanied by active pain, amounts to disability.'"
However, we do not believe that plaintiff can be classified as totally and permanently disabled from doing work of any reasonable character as a result of any injury received in the accident of February, 1954. While there were some slight effects of the accident remaining as of the dates Drs. Paine *442 and Pollingue last saw Henderson, we are convinced that, whatever the complaints were, they had completely disappeared by December 6, 1954, on which date Dr. Battalora made the examination after having the additional X-rays made. The trial judge evidently believed the testimony of Dr. Battalora to the effect that, as of December 6, 1954, Henderson was under no disability from the accident, and our study of the record convinces us of the correctness of that opinion.
While counsel for plaintiff strenuously contends that Henderson is unable to return to his employment because of a ruptured intervertebral disc, the record does not convince us that the plaintiff sustained such an injury in the accident. The only evidence in the record from any of the physicians regarding a ruptured intervertebral disc emanated from plaintiff's witnesses, Dr. Fisher, the internist and surgeon, and Dr. Lilly, a radiologist, and it must be noted that neither of these physicians would definitely or positively state that Henderson labors under the handicap of having a ruptured intervertebral disc. Both physicians admitted that Henderson's spine had undergone hypertrophic changes and in this all experts agree. Considering the medical testimony as a whole we are of the opinion that if Henderson could be considered physically incapable of carrying on the duties of his occupation, that condition results not from any injuries sustained in the accident but from natural degenerative causes.
We might mention also that Dr. Fisher is not a specialist in orthopedic surgery and his testimony regarding whether Henderson had sustained a ruptured intervertebral disc does not appear to carry the same weight as would be accorded to the testimony of defendant's experts who are all qualified orthopedists.
In the case of Price v. T. L. James & Co., La.App., 53 So.2d 182, as is expressed in syllabus No. 3, it was said:
"Opinion of physician who was not a specialist in orthopedic surgery on question of whether employee sustained a sacroiliac strain did not carry probative weight of opinions of doctors so trained and experienced."
In order for us to hold that the plaintiff had sustained a ruptured intervertebral disc, we would have to indulge in some rank speculation. A plaintiff in a suit under the Workmen's Compensation Act is required to make out his case by a preponderance of testimony and with the same legal certainty as is required in any other civil case. Speculation, conjecture, mere possibility, and even unsupported probability, are not sufficient to support a judgment. Roberts v. M. S. Carroll Co., La.App., 68 So.2d 689.
The appellant claims that the trial judge erred in not allowing a $100 fee as an expert witness to Dr. Charles Lilly, the radiologist who testified as to what the X-ray plates made by him reflected. Dr. Lilly was admitted by defendant to be an expert in the field of radiology. He testified as such giving his opinion on questions propounded by both counsel. We think he should be allowed an expert's fee of $100.
We also believe that Dr. Fisher's expert's fee should be increased to the sum of $100 since a substantial portion of his testimony was expert testimony in answer to questions by counsel and the Court.
Therefore, the judgment is amended by allowing an expert's fee of $100 to Dr. Charles Lilly and by increasing the fee of Dr. William Fisher from $50 to $100. As thus amended the judgment is affirmed, defendant and appellee to pay all costs.
Amended and affirmed.