153 So.2d 553 (1963)
Ira HALL
v.
LIBERTY MUTUAL INSURANCE COMPANY et al.
No. 5824.
Court of Appeal of Louisiana, First Circuit.
May 3, 1963.
Rehearing Denied June 3, 1963.
*554 Taylor, Porter, Brooks, Fuller & Phillips, by Robert J. Vandaworker, Baton Rouge, for appellant.
Palmer & Palmer, by C. B. W. Palmer, Amite, Burrell J. Carter, Greensburg, for appellee.
Before ELLIS, LOTTINGER, HERGET, LANDRY and REID, JJ.
LANDRY, Judge.
This is an action for workmen's compensation benefits. In the court below judgment was rendered in favor of plaintiff-employee, Ira Hall, and against defendants, Buddy Eanes Homebuilders, Inc., (plaintiff's employer), and said employer's compensation insurer, Liberty Mutual Insurance Company, awarding (1) compensation at the rate of $35.00 weekly for a maximum of 400 weeks; (2) medical expense in the sum of $393.00; (3) statutory penalties of *555 12%; and (4) attorney's fees in the sum $1,000.00, subject to credit in the sum of $90.00 for compensation paid. From the aforesaid adverse judgment defendants have appealed and plaintiff has answered the appeal praying for an increase in the award of attorney's fees to the sum of $2,500.00.
Plaintiff-appellee is a common laborer 44 years of age. He was employed by defendant corporation as a "cleanup-man" whose principal duties consisted of readying newly constructed homes for occupancy by cleaning windows, waxing floors, cleaning up spilled paint and otherwise putting the "finishing touch" upon homes constructed by his employer and tendered the owner for acceptancy and occupancy.
It is undisputed plaintiff sustained an injury in the course of his employment by defendant on March 31, 1960. On the day in question plaintiff and three other employees were engaged in setting cement patio blocks approximately 4 inches in thickness and measuring approximately four feet square. While placing one of these blocks, it fell, crushing plaintiff's right middle finger traumatically amputating a small portion of the end thereof.
The gravamen of plaintiff's complaint is that the injury has totally and permanently disabled him in that he is unable to work without significant and appreciable pain.
Appellants maintain plaintiff was completely recovered from his injuries by May 25, 1960, on which date he resumed his employment and continued therein until November 15, 1960, at which time appellee was discharged for reasons unrelated to his aforesaid injury.
Immediately following the accident plaintiff was taken to Dr. Louis Mayer, a surgeon, who, testifying on behalf of appellants, stated he first saw plaintiff in Baton Rouge on March 31, 1960. Examination revealed appellee had lost the distal (end) portion of the middle finger of the right hand and the distal half of the nail. Under local anesthesia, in the emergency room of the Baton Rouge General Hospital, the distal portion of the finger was amputated to a point beyond the traumatized area to remove the torn flesh and obtain sufficient skin to form a flap with which to cover the bone. Plaintiff was not hospitalized. Dr.Mayer dressed the finger through the first week of April during which time plaintiff wore a finger guard. Plaintiff returned to Dr. Mayer April 15, complaining of soreness in the injured member but upon examination the wound appeared to be healing very well and the sutures were removed at this time. On April 22, Dr. Mayer advised plaintiff to wear a vaseline covered band-aid to protect the end of his finger and further suggested plaintiff resume his employment the following week. Plaintiff returned to Dr. Mayer April 27, 1960, on which date Dr. Mayer removed a small piece of fingernail found to be growing out of one corner of the flap enclosure, the revision being accomplished in Dr. Mayer's office. On September 12, 1960, the remaining nail bed was resected and four days later, namely, on September 16, plaintiff returned for removal of the sutures and final dressing of the wound.
In the opinion of Dr. Mayer, from the beginning, appellee's complaints of pain were out of proportion to the degree and extent of appellee's injury. Believing plaintiff to be exaggerating the effect of his injury, Dr. Mayer referred appellee to Dr. F. C. McMains, Orthopedic Surgeon, for evaluation, in June, 1960. Appellee returned to Dr. Mayer on November 21, 1960, at which time a small piece of nail was found to be protruding from the dorsal surface of the end of the injured finger. Dr. Mayer's examination on this date disclosed no further treatment to be necessary or required. Except for the cosmetic effect of a small bit of nail being evident, Dr. Mayer found no reason to do anything further to the finger. He explained he did not completely remove the entire distal phalange but wished to save as much of the finger as he could because the presence of even a portion of the distal phalange would be of value to *556 an individual. In this connection he explained he amputated beyond the traumatized area to remove all crushed flesh to insure proper healing while at the same time preserving as much of the finger as possible. Conceding a small piece of residual nail bed remains on the dorsal surface of plaintiff's injured finger, nevertheless, he is of the opinion further surgery is unnecessary. He is also of the opinion plaintiff is able to resume his former employment without appreciable or significant pain. According to Dr. Mayer, the remaining small portion of nail bed should not produce great pain because it is situated on the dorsal surface and not on the end. Additionally, Dr. Mayer stated plaintiff has good volar skin covering the end of the finger in which finding he is corroborated by other medical testimony of record.
Although Dr. Mayer conceded the piece of nail growing out of the residual nail bed could strike objects in the performance of common labor if it were unfiled or unclipped, he also stated clipping or filing the nail is a simple procedure which could be accomplished by anyone. In essence Dr. Mayer stated that if plaintiff kept the piece of nail filed and clipped plaintiff should experience no difficulty or significant pain from the finger while performing the duties of a laborer.
Testifying on behalf of appellants, Dr. F. C. McMains, Orthopedic Surgeon, stated he examined plaintiff on two occasions; first at the request of Dr. Mayer and secondly, in preparation for testifying on the trial of this cause. On June 24, 1960, Dr. McMains' examination revealed a traumatic amputation at the level of the base of the nail. He further observed a good volar flap of skin had been brought up over the wound. The injury appeared well healed except only one spot in the approximate center where he found a suture which he removed. At this time plaintiff lacked approximately 10 degrees of full flexion of the P.I.P. joint and had only about 10 to 15 degrees of flexion of the D.I.P. joint with full extension in both joints. X-ray examination showed no bony spurs or other abnormalities. Plaintiff still exhibited a little hypersensitiveness to touch but since the accident occurred only three months previously, Dr. McMains did not consider this fact particularly significant. On March 7, 1962, Dr. McMains' second examination revealed substantially similar findings except he then noted plaintiff enjoyed full flexion in his P.I.P. joint. This examination disclosed a small deformed nail growing out of the dorsal surface of the affected finger. Measurement revealed plaintiff's right forearm to be ¼ inch larger than the left which indicated plaintiff, being right handed, was using his right arm and not "favoring it". Dr. McMains also noted calluses on both hands of approximately identical density, further indicating plaintiff was using his right hand. X-rays made on this latter examination showed no significant abnormality. Plaintiff was found to be hypersensitive over the pad of his stump on deep compaction. Plaintiff's disability was rated at four per cent of the hand predicated upon loss of motion in the distal interphalangeal joint of the affected finger. At this time Dr. McMains felt plaintiff was able to resume his former duties. Dr. McMains further stated plaintiff had no other orthopedic problems and no surgery was indicated or recommended. Regarding plaintiff's complaints of pain, he stated:
"I think if the man will keep his nail trimmed back that he probablyif he jammed his finger it would be a little bit more uncomfortable to him than another finger. True enough, if he jams any of the others, they are going to hurt, but I do feel that this man is capable of doing work as he was before without severe, excruciating or disabling type of pain. I do not for one minute say that he may have some discomfort occasionally but I feel that he is capable of doing it and can do it."
Dr. R. E. Dupre, appearing on behalf of plaintiff-appellee, testified herein by deposition. Before reviewing Dr. Dupre's testimony we will first dispose of appellants' *557 specification of error to the effect the trial court improperly admitted the deposition of the witness in evidence notwithstanding appellee's failure to comply with the provisions of LSA-C.C.P. Article 1428(3), the applicable portion of which reads as follows:
"Art. 1428. Use of deposition * * *
"(3) The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds: * * * (b) that the witness is at a greater distance than one hundred miles from the place of trial or hearing or is outside of this state, unless it appears that the absence of the witness was procured by the party offering the deposition; * * *."
Our esteemed brother below did not favor us with written reasons for judgment consequently there is no indication of the trial court's findings regarding the distance Dr. Dupre was removed from Greensburg, Louisiana, the seat of St. Helena Parish, in which parish the instant matter was tried. In addition, the transcript before us discloses no ruling by the trial court on counsel's objection to introduction of Dr. Dupre's deposition in evidence. The record does conclusively establish and show, however, Dr. Dupre's deposition was taken in his office in Ville Platte, Evangeline Parish. Predicated upon the foregoing, we take judicial cognizance of the fact the witness in question was at a greater distance than 100 miles from the place of trial. Considering the record affirmatively discloses the provisions of Article 1428 LSA-C.C.P. (3) were fulfilled, it may be assumed the trial court so found in admitting the deposition in evidence. It follows that appellants' said objection was without merit and the controversial deposition was properly admitted in evidence by the trial court.
Dr. Dupre, a general practitioner, stated he examined plaintiff in his office at Ville Platte, Louisiana, on March 28, 1961. (It will be noted his examination was conducted approximately one year following the accident). Upon examination, Dr. Dupre found the finger presented a good appearance except that the base of the finger nail remained in the skin flap covering the tip of the finger and was tender on palpation. He was of the opinion the condition would produce pain in grasping and further considered plaintiff disabled by virtue of the remaining piece of nail. Dr. Dupre felt plaintiff's disability would continue until the remaining nail was removed and advised its removal which he stated would involve only a minor operation. He further recommended consultation with a surgeon concerning the possibility of removing the remaining piece of nail bed which caused the nail to grow. In the opinion of Dr. Dupre, removal of the nail itself would afford plaintiff temporary relief until a new nail grew out but, to effect a permanent cure the nail bed should be removed or cauterized. According to Dr. Dupre, plaintiff, a former patient, did not consult him for treatment of plaintiff's finger on March 28, 1961, but arranged the appointment because of other difficulties being experienced by plaintiff at the time. It was only after plaintiff came to his office and a general physical check-up was commenced that plaintiff mentioned his finger and requested it be examined. Dr. Dupre frankly admitted he then reluctantly examined plaintiff's finger only to please plaintiff and that he had no desire to do so because of his apprehension of being involved in litigation as a result thereof. He further conceded he then suggested plaintiff consult an attorney because prescription was about to run on plaintiff's possible claim for compensation benefits.
Testifying on behalf of appellee, Dr. Blaise Salatich, Orthopedic Surgeon, by deposition stated he examined plaintiff June 14, 1961, and noted a visible and palpable loss of normal muscle tonicity of the right forearm musculature which appeared more outstanding throughout the common flexor muscle group. He found the distal portion of the right middle finger missing, with *558 the amputation through the distal phalanx and associated the condition with a residual bulbous soft tissue outline of the amputation stump. Adequate soft tissue pad was found to be present. Dr. Salatich was able to elicit moderate tenderness over and adjacent to the amputation stump, with marked sensitivity and increased tenderness over some apparent residual nail bed or bony irregularity on the dorsal aspect. He also noted loss of gripping and grasping strength in plaintiff's right hand and some loss of normal flexibility of movement of the remaining portion of the middle finger. Areas of hypesthesia and marked hyperthesia of the skin overlaying and adjacent to the amputation stump were also noted as was some hypesthesia of the skin overlying the distal portion of the adjacent right second and fourth fingers, said latter condition being determined by comparison of sensory integumental stimulation. X-rays disclosed loss of the distal portion of the distal phalanx of the middle finger as well as associated soft tissue structures with retention and preservation of the distal interphalangeal joint. Approximately 90% of the distal phalanx was found to have been amputated with only the small articular aspect of the base remaining. Plaintiff also presented a small cystic area in the subarticular portion, which is that portion just below the joint surface of the distal shaft or outer portion of the middle phalanx of the third finger.
In Dr. Salatich's opinion, "The amputation stump presented clinical findings as to pain, sensitivity and inability to exert normal, sustained degrees of pressure, gripping and grasping strength * * *." Because plaintiff is right handed, Dr. Salatich thought the overall residual disability of his right hand, in performing arduous physical labor required by plaintiff in filling the duties of his occupation as common laborer, was increased out of proportion to the specific pathology described. Plaintiff's disability was deemed permanent in nature and plaintiff's persisting disfunction and pain were not considered in any way unusual but were apparently well founded considering the circumstances of the accident.
On February 5, 1962, Dr. Salatich performed a second complete orthopedic examination of plaintiff and reached the same conclusion after consideration of all previous information obtained as well as "additional rather outstanding and significant factual information" furnished by plaintiff's attorney, "together with a perusal of his medical reports."
Upon the second examination Dr. Salatich was of the opinion plaintiff then presented indications for treatment predominately of physiotherapy involving preferably short-wave diathermy or other types of electrically stimulating heat therapy focused over the hand at frequent intervals for a considerable period of time. Dr. Salatich also felt surgical intervention to improve comfort and function or a revision of the amputation stump to remove the remaining small portion of nail bed or nail fragment at the end of the stump would not necessarily result in such clinical improvement as to assure satisfactory cure and rehabilitation. In this connection he stated such surgical procedures would not materially change the "over-all unfavorable status of the involved soft structures remaining of this finger". Irrespective of any treatment plaintiff might receive, Dr. Salatich considered a "guarded prognosis should be maintained" in view of the previously described unfavorable circumstances found. The most outstanding unfavorable aspect, in Dr. Salatich's opinion being "this quite severe and fairly well localized significant crushing-type direct trauma exerted on the fingers of his right hand of sufficient nonlacerational suddenness and severity to spontaneously amputate a portion of his right middle finger."
Appellee testified he worked for defendant corporation approximately three years preceding his injury. He concedes he returned to work 24 days following the accident and also admits his discharge by defendant in November, 1960, for causes unrelated *559 to the action. Appellee stated he last consulted a doctor for treatment of his injury when he visited Dr. Mayer three days after his discharge in November, 1960. According to plaintiff his finger has pained him constantly since the accidentit has never stopped hurting and hurts more when he uses his right hand. Upon returning to work he was put on light duty and was not required by his employer to perform duties which he refused to perform because of his injury. On occasion, his finger would cause him so much pain and discomfort he was unable to sleep at night but despite this loss of sleep he nevertheless invariably reported for work the following day. Plaintiff's testimony regarding lighter work, however, is contrary to the stipulated testimony of his superiors, George Roussell and A. J. Kent, it being stipulated that if said witnesses were called to testify on behalf of defendants they would aver plaintiff returned to his regular duties and continued his employment in such capacity until discharged on or about November 15, 1960. Plaintiff acknowledges he was employed by the Celotex Corporation, Marrero, Louisiana, from November 25, 1960, until December 23, 1960, on which latter date said concern ceased its seasonal operation. During this period plaintiff conceded he was employed regularly. He stated, however, he was employed as a "loader", his duties in such capacity consisting of placing bales of bagasse on flat railroad cars so that cranes could pick them up for stacking. He explained that the bales are pressed out of the end of the bailer in such manner they are left standing on edge as they emerge from the machine. From this position the "loader" handles the bales by hand. The bales, weighing between 250 and 325 pounds are manually moved a distance of 6 to 8 feet. Admittedly the work is laborious and requires tremendous physical strength and endurance. Plaintiff maintains, however, he performed this arduous work only one day and then "swapped jobs" with a "wiretier" whose dutes were not nearly so strenuous. After leaving defendant's employ, plaintiff admittedly engaged in employment such as filling in sunken graves in a cemetery and also self-employment on his farm and the manufacturing of cement gravestones which were fabricated by mixing concrete by hand. Upon initial direct examination plaintiff contradicted Dr. Dupre inasmuch as plaintiff testified he consulted Dr. Dupre initially about his finger and only incidentally mentioned other troubles. In this connection plaintiff stated Dr. Dupre, upon being informed the injury had occurred almost a year previously, advised plaintiff if plaintiff desired to protect his rights, plaintiff would have to do so before the year expired. Subsequently, however, during the course of plaintiff's examination he virtually admitted he did not consult Dr. Dupre primarily for his finger but for other reasons and the matter of the injured finger was brought to light during the course of the examination by Dr. Dupre.
James J. Naquin, labor supervisor, Celotex Corporation, stated plaintiff worked for his company from November 25 to December 23, 1960, the latter date being the end of the sugar cane grinding season. Plaintiff was first employed as a loader and remained so engaged until December 6, 1960, on which date the regular loader returned to work after an absence due to illness. Hall was then put on as a wire tier on which position he remained until the close of the season. Naquin explained that in the bailing of bagasse wire is used to hold the bales together as they expand upon coming from the baling machine. During the baling process wire is fed into the baler and the end of the wire cut off by a "cutter". The "wire tier" then grabs the two ends of the wire and joins them by making a loop in one end and then running the other end through the loop and twisting it around several times so that it will not slip as the bale expands when leaving the baling machine. Naquin knew nothing of plaintiff's injured hand and denied any other employee exchanged jobs with plaintiff although he *560 acknowledged employees did sometimes relieve one another temporarily.
In substantiation of his claim of being unable to work without appreciable and significant pain, appellee produced several lay witnesses who testified in substance that plaintiff was a different person following his injury. These witnesses, including plaintiff's wife and acquaintances, stated in essence that plaintiff constantly complained of pain following the accident and thereafter he was unable to work around his farm as he had done previous to his injury. One or two of plaintiff's said witnesses also testified concerning plaintiff's reluctance to shake hands with his friends and acquaintances because his finger and hand were sensitive to touch.
From the foregoing analysis of the testimony, it is apparent the medical testimony is not only conflicting but numerically equal. Our careful analysis of the medical evidence, however, reveals it is not equally divided in quality of persuasiveness.
In evaluating medical testimony courts are guided by certain accepted and well established principles. See Malone, Louisiana Workmen's Compensation § 286, pp. 366 ff. The testimony of the physician who examined an injured employee immediately following injury may be accepted in preference to the opinion of one who examined him subsequently. Royer v. Carey, La.App., 145 So. 381. The opportunity for extended observation, such as that afforded the treating physician, gives added credence to the testimony of the medical expert. Anderson v. Peek, La.App., 102 So.2d 776; Walker v. Monroe, La.App., 62 So.2d 676. The specialist is preferred to the general practitioner regarding matters which fall within his field of specialization. Allen v. Coal Operators Casualty Company, La.App., 124 So.2d 344.
In the present case plaintiff was seen by Dr. Dupre on only one occasion and by Dr. Salatich twice. By his own admission, Dr. Dupre reluctantly examined plaintiff at a time when he was in a hurry and anxious to leave his office. In his opinion, plaintiff was totally disabled because of the presence of a small piece of residual nail bed and a piece of nail growing therefrom. He conceded, however, plaintiff would obtain temporary relief by clipping or filing the nail which testimony is consistent with that of Drs. Mayer and McMains who felt plaintiff would obtain adequate relief by simply clipping or filing the nail to avoid irritation. Considered in its entirety, Dr. Dupre's testimony reveals no satisfactory explanation for his conclusion plaintiff was totally and permanently disabled.
Dr. Salatich appeared to have been considerably impressed by three factors, namely: (1) the hyperesthesia and hypesthesia at the site of the injury; (2) certain unexplained circumstances of which he was informed by plaintiff's attorney; and (3) the nature of the accident which resulted in the injury. Regarding the latter factor, it would appear that if the nature of the accident be considered a clinical fact, the physician who attended the patient immediately following the accident would be in at least as good position, if not better, to evaluate such circumstance as would be one who learned of the accident more than one year later incident to an examination conducted solely in preparation for testifying upon trial. The fact that Dr. Salatich believed the sudden traumatic amputation of a portion of plaintiff's finger by an unexpected severe blow was the most outstanding unfavorable aspect of the case, would seem to indicate he was more impressed by the history than his own clinical findings. Moreover, we note no satisfactory explanation of his testimony that he spent approximately two hours conducting a visual examination of plaintiff's hand on the occasion of his second examination. Similarly if, as Dr. Salatich implied, the nature of the accident as he understood it, was calculated to produce permanent disability which, in his opinion, was unlikely to be corrected by further surgical procedure, his reasons for such opinion and conclusion were not adequately *561 set forth and explained. We believe it elementary that disability is not to be determined by the nature of the accident alone. We are cognizant of numerous cases in which claimants have suffered accidents far more serious and have sustained injuries considerably more severe than has plaintiff herein and have been denied compensation because of their failure to establish by a preponderance of evidence the existence of disability resulting therefrom.
On the other hand, however, Dr. Mayer saw plaintiff immediately following the accident and attended him over a period of time. Moreover, on several occasions while plaintiff was yet engaged in his former employment, Dr. Mayer had occasion to examine plaintiff's finger. His diagnosis that plaintiff was able to resume his former employment and could continue his former duties without appreciable or significant disabling pain was confirmed and corroborated by Dr. McMains. To a limited degree Dr. Dupre's testimony coincides with that of Drs. Mayer and McMains. In this regard we refer to Dr. Dupre's admission clipping and filing of the small piece of nail growing out of the end of plaintiff's finger would afford relief from the pain of which plaintiff complained.
Our jurisprudence is settled to the effect a plaintiff in a workmen's compensation action bears the burden of proving his case to a legal certainty by a fair preponderance of evidence. Stuckey v. City of Alexandria, La.App., 81 So.2d 46; Henderson v. New Amsterdam Casualty Company, La.App., 80 So.2d 438.
We are fully cognizant of the rule which holds lay testimony may be resorted to when medical testimony is conflicting. In the present case, however, because of numerous contradictions in plaintiff's own testimony, we are disposed to discount plaintiff's credibility to some extent. We believe, as did Doctors Mayer and McMains, plaintiff has been prone to exaggerate the effects of his injury. We so conclude, not only on the basis of the testimony of Drs. Mayer and McMains but also on the lay testimony which shows plaintiff herein continued in his former employment for a period of approximately eight months following his injury and thereafter engaged in similar work when same was available. Had plaintiff been suffering to the extent he testified, it is most unlikely he could have continued his former employment and other similar undertakings continuously and until such time as he was terminated therein for causes unrelated to his injury.
We believe the record herein establishes that following the accident, plaintiff worked when he could obtain work and was never discharged from or voluntarily left any employment because of disability resulting from his injury in defendant's employ. Also significant is the fact plaintiff sought no treatment for the injured finger from November, 1960, to the date of the trial, namely, April 12, 1962. It would appear plaintiff would have consulted medical authority during this extended period had he in fact suffered pain to the extent indicated in his testimony given at the trial.
We are of the opinion plaintiff herein has failed to discharge the burden of proof incumbent upon him and our esteemed brother below erred in concluding otherwise. It follows that the judgment of the trial court must be reversed and plaintiff's suit dismissed at plaintiff's cost.
One other matter remains for disposition. Among defendants' specification of errors is the complaint the learned trial court improperly declined to admit in evidence plaintiff's deposition offered in impeachment of plaintiff's testimony on the ground it contained statements contradictory to those made by plaintiff in testimony given at the trial. The record reveals our esteemed brother below refused to admit appellee's deposition on the ground appellee was personally present in court and available for examination. In so doing, the learned trial court committed error.
*562 The discovery deposition of a party litigation may be used by the adverse party for any purpose. Little v. Hughes, La.App., 136 So. 2d 448; LSA-C.C.P. Article 1428(2).
For the reasons hereinabove set forth, it is ordered, adjudged and decreed the judgment of the trial court in favor of plaintiff, Ira Hall, and against defendants, Buddy Eanes Homebuilders, Inc. and Liberty Mutual Insurance Company, be and the same is hereby annulled, reversed and set aside and judgment rendered herein in favor of said defendants, Buddy Eanes Homebuilders, Inc. and Liberty Mutual Insurance Company, and against plaintiff, Ira Hall, rejecting and dismissing said plaintiff's demands at plaintiff's cost.
Reversed and rendered.