The plaintiff, Avery Harmon, a Negro past the age of sixty years, who was employed by the defendant, G. Curtis McDaniel, as a common laborer, has instituted this suit to recover workmen's compensation from his employer and the latter's compensation insurance carrier, Maryland Casualty Company of Baltimore, Maryland, for total permanent disability. In his petition he alleges that on the morning of January 22, 1947, whilst he was engaged in performing some of his duties, he suffered an injury to his right ankle while handling a slab of concrete and that since then he has been unable to do work of any reasonable character such as the work he is fitted to do. He was paid compensation until September 1, 1947, at which time he was discharged by the doctor who was attending to his injury as being able to return to his duties. Further compensation was refused and the object of his suit is to recover the balance that is due him for his permanent and total disability as alleged. He also seeks to recover for medical services rendered to him by physicians who saw him and examined him after he had been discharged by the attending physician who had been employed by the defendants.
There is no dispute regarding the plaintiff's employment and the accident in which he sustained the injury to his ankle nor is there any dispute regarding the amount of wages he received. The principal defense to the suit is that plaintiff had recovered in September, 1947, when he was discharged by Dr. H. L. Gardiner, defendant's attending physician, and was able to resume his duties. There is a further defense made on the ground that plaintiff had agreed to a compromise lump sum settlement of his claim for compensation during the month of October, 1947. On both of these defenses the lower court was concerned with a factual situation and on both points the judgment was adverse to the defendants' contentions. Plaintiff was awarded compensation as he had prayed for at the rate of $15.60 per week as for total and permanent disability, less the amount of compensation which he had been paid, and also the fees of the doctors who examined him and testified in his behalf, which were taxed as costs. From that judgment the defendants have taken this appeal.
Taking up first the defense based on the ground that the plaintiff had recovered from his injury in September, 1947, when he was discharged by Dr. Gardiner, we find that the medical testimony on this point preponderates in favor of the plaintiff.
His injury, according to Dr. Gardiner's report, consisted of a laceration of ligaments and fracture of the internal malleolus of the right ankle. Dr. Gardiner's treatment consisted of an application of a plaster cast on January 22, 1947, the date of the accident, which he removed on March 25, 1947. The removal of the cast was followed by diathermic treatments given daily and he was finally discharged on September 1, 1947. This is about the sum and substance of Dr. Gardiner's report. In testifying as a witness, Dr. Gardiner says that during the time he was taking his treatments, plaintiff did complain of soreness in the right ankle and that is why he continued the treatments for such a long period. He says that he wanted to give him the benefit of every doubt. When asked if he found any arthritis in the ankle, he says not at the time he treated him. As we understand the testimony he has not seen the plaintiff or examined him since he discharged him in September, 1947.
Dr. Gardiner gives the impression that this man is exaggerating his symptoms at this time and seems to base his opinion on the fact that he is feigning a limp. He seemed to have had some doubt as to the plaintiff's honesty about this at the time he was treating him and testified that he followed him from his office on a couple of occasions and found that after he got a half block away he walked without a limp. This caused him to have some suspicion about the complaints he made of pain and that is why he decided to discharge him as being able to return to work on September 1, 1947. The doctor would not say that plaintiff was a malingerer but he does state *Page 251 
that he thought his complaints were exaggerated.
After plaintiff had been discharged by Dr. Gardiner, he was sent to be examined by Dr. Jack Wickstrom at Lafayette. This doctor first examined him on October 7, 1947. His clinical examination revealed noted variation in the right ankle from a normal ankle and he therefore requested an x-ray examination which was made by Dr. John M. Miles. In interpreting the x-rays, Dr. Wickstrom's report indicates that he found a definite disability in the right ankle in as much as there was a malunited bi-malleolar fracture of that ankle and although he found no evidence of any arthritic change at the time, it was his opinion that some arthritis would develop which would result in narrowing the joint and he would have persistent pain because of the irregularity of the joint surface in the medial malleolus. His report showed his opinion to be that the plaintiff would be able to return to his former duties of a laborer but that he would have persistent pain in his ankle especially with fatigue and prolonged standing or walking. In his first report this doctor estimated the patient's disability as being approximately 15 per cent which at first glance might mean that his total disability was only 15 per cent but in a subsequent report dated October 17, 1947, he stated that in rating the disability as he did he felt that the 15 per cent disability related to his foot and ankle. In other words, we take it that what he meant was that he did not rate the disability at 15 per cent total disability but that was the percentage of disability to the foot and ankle. In this last report he again states that if the patient returns to his former duties as a laborer and has to undergo prolonged standing or walking he will have persistent pain in his ankle due to traumatic arthritis which he found present at that time and which he says will probably become worse as he grows older.
In testifying as a witness, Dr. Wickstrom stated facts very much along the same line as those given in his report and appeared to be a little firmer in his opinion that this man is suffering from his injury due to the way in which the bony union took place at the healing of the fracture and because of the traumatic arthritis which is present. In referring to the union of the bone and in using the word "malunited", he explained that to mean that the position of the fragments, if they have united, "is not anatomically correct". He candidly admitted that he had to rely on the patient's own statements regarding the amount of pain he suffers, but he appears to be convinced that he does have considerable pain and his testimony regarding the nature of the injury convinces us that he understands the case very well. His experience and qualifications are somewhat questioned by counsel for defendants but he impresses us as being very well qualified as an expert in his line and since he specialized in orthopedics, we would say that his testimony in this case is entitled to greater consideration than that of Dr. Gardiner who is an older physician and more experienced in general practice, but who makes no claim, as we understand, to having specialized in any particular branch in the practice of medicine.
Dr. Wickstrom's testimony is supported to some extent by that of Dr. John M. Miles, who made the x-ray plates at his request. He also, found a slight irregularity of the surface of the tibia and whilst union of the bones was good, he also stated that the picture showed the slight displacement which he had mentioned before and also a slight swelling of the soft tissue around the ankle joint. This soft tissue he said, could be present in arthritis in injuries of this kind. He would not make a positive statement that there was arthritis in this case, but neither could he rule it out in the presence of the swelling of the soft tissue.
The foregoing comprises all of the medical testimony in the case and as we have stated, it clearly reveals a strong preponderance in favor of the plaintiff's disability on account of the injury to his ankle.
When we come to consider the lay testimony we find it to be all on the side of the plaintiff. Quite a large number of witnesses testified that this man had been a conscientious, hard working individual all of his life and that since his injury he had been unable to do any more hard labor. He tried on one or two occasions but wasn't *Page 252 
able to stand more than one or two days work at a time. The testimony of all these witnesses is criticized on the ground that they were all closely related to the plaintiff and were prejudiced in his favor, but this we do not find to be so. It is true that his wife is one of these witnesses and so were two of his sons and a son-in-law, but they did not show any particular bias as far as we can see. There were some others who testified who were not related to him and their testimony was all along the same line.
The plaintiff's testimony is severely attacked by counsel for defendants and whilst he did make statements which are open to being questioned, we have to take into account the fact that he is an illiterate and ignorant Negro who is not accustomed to the ways of the courtroom and to being cross-examined on the witness stand. Much is made of the fact that was brought out that he may have collected social security payments sometime long before his accident when he was actually working, and for this, he is charged with dishonesty. We have some doubt that the man meant to state that he collected the two payments which amounted to two checks of $20.00 each at a time when he was actually working and earning wages from his employer. But even so, that has nothing to do with this case except that it may affect his credibility and his veracity. There is enough testimony however, without having to consider his own, that he is presently disabled within the terms and the meaning of the workmen's compensation law.
With regard to the second defense, no extended discussion seems to be necessary. The compensation insurance carrier no doubt made a strong effort to try to have a compromise settlement of this claim, even going to the extent of preparing the necessary papers and issuing the check for the amount which it is stated was actually agreed upon. Whilst the papers were signed by the insurance company they never were signed either by the plaintiff or by his attorney and the latter denies definitely that any agreement was ever reached.
The case was correctly decided in the lower court and for the reasons herein stated, the judgment appealed from is affirmed.