CULPEPPER, Judge.
In this suit for workmen’s compensation benefits, plaintiff alleges that he received injuries in an accident on January 29, 1959, while performing services in the scope of his employment for J. C. Slaughter. Plaintiff instituted this suit against Coal Operators Casualty Company, the workmen’s compensation insurer for his employer, and prays for judgment for weekly payments at the maximum statutory rate as for total and permanent disability, subject to a credit for those amounts which have already been paid.
After trial on the merits, the lower court rendered judgment in favor of the plaintiff for the sum of $31.20 per week beginning January 29, 1959, for the period of his disability not to exceed four hundred weeks, less a credit for compensation already paid. From this judgment defendant has appealed.
The sole issue for determination on this appeal is the extent and duration of plaintiff’s disability. The evidence shows that on January 29, 1959, the plaintiff, a well-developed 26-year old colored male, was employed by J. C. Slaughter as a pulpwood loader and hauler. The plaintiff had picked up and placed on his left shoulder a stick of pulpwood weighing approximately 150 lbs. and, with the assistance of a helper, was attempting to place this piece of wood on the truck, which was already almost completely loaded, the top of the load being approximately nine feet from the ground. Plaintiff turned with his hack toward the truck and he and the helper then attempted to throw the stick of pulpwood up on the truck, when suddenly the helper lost control of the stick of wood and it fell back, striking plaintiff on the right side of his head. Plaintiff was knocked to his knees and dazed, but he was not rendered unconscious. They stopped work and plaintiff drove the truck approximately one mile out of the woods and then he returned to his home and has not worked since.
During the next day or two, plaintiff went to see Dr. Kopfinger in Many, Louisiana, but he did not have from his employer an authorization for treatment so he was not actually examined by Dr. Kopfinger until February 2, 1959. Since that time and continuously up until the date of the trial of this case, plaintiff has been under the treatment of various doctors. '
This case involves principally the court’s analyzing and evaluating the testimony of the various expert medical witnesses. Dr. John A. Kopfinger of M.any, Louisiana, was the first doctor to see and treat the plaintiff after the accident. Dr. Kopfinger testified that he first saw the plaintiff on February 2, 1959, at which time plaintiff had a bruised area on the right side of his head and was complaining of headaches and pain *346 in his neck. Dr. Kopfinger considered the injury sufficiently serious that he took x-rays which he found were negative as to fracture. He continued to see and treat plaintiff until February 14, 19S9, but being unable to find any positive objective symptoms, he, on that date, advised the plaintiff to return to work but to come back if he continued to have further trouble.
The plaintiff did continue to, have further trouble, but instead of returning to see Dr. Kopfinger he went instead to see Dr. J. Lana Sauls of Zwolle, who is also a general practitioner, Dr. Sauls first saw the plaintiff on February 16, 19S9, and after hearing the history of the case and plaintiff’s complaints of headaches and after finding an optic disc was swollen, he diagnosed plaintiff’s symptoms as those which follow a concussion of the brain. Dr. Sauls prescribed bed rest and medicine for pain and continued to see and treat the plaintiff. Plaintiff continued to have severe headaches and he spit up some blood, and in view of these symptoms and the swollen optic disc which was indicative of possible intercranial pressure, Dr. Sauls decided to refer the plaintiff to Dr. Heinz K. Faludi, a specialist'in neurosurgery in Shreveport. Dr. Faludi first saw the plaintiff during February or March of 1959, and on that occasion his diagnosis was: (1) Contusions to left parietal scalp, (2) Cervical sprain, (3) Post cerebral concussion state, mild, and (4) Hypertension, mild.
X-rays taken by Dr. Faludi showed no definite fractures but did show a widening of the lambdoid suture markings, which is the serrated line or joint where the bones of the skull join. It was the opinion of Dr. Faludi that this widening of the lamb-doid suture could have the same effect as a fracture. Dr. Faludi made a report to Dr. Sauls, the treating physician, stating that it might be advisable to add a cervical collar if the symptoms persisted.
Plaintiff then returned to Dr. Sauls, who continued to see and treat the plaintiff for headaches and pain in his neck, left shoulder and down his left arm, until on April 13, 1959, Dr. Sauls discharged plaintiff as being able to return to work. However, under cross-examination on the trial of this case, Dr. Sauls admitted that he had possibly misinterpreted Dr. Faludi’s report and that, in any event, he would defer to Dr. Faludi’s opinion regarding the man because,, of course, the complaints fell within the specialty practiced by Dr. Faludi. We find Dr. Sauls testified as follows:
“Q. Doctor, I don’t like to belabor a point like this and I certainly mean not to distract one bit from your own observations, but since you did send this man to Dr. Faludi, a neurosurgeon, I feel obligated to ask you this question : If you knew Dr. Faludi had continued to follow this man and had seen him at fairly regular intervals up until the 15th of September, and still felt that this man was disabled, would you be inclined, still, to defer to Dr. Faludi in this case?
“A. Yes.”
After leaving Dr. Sauls the plaintiff returned to Dr. Faludi on May 18, 1959. Continuing symptoms made Dr. Faludi suspect that there might be a herniated cervical disc, in addition to the cervical sprain. Dr. Faludi continued to see and treat the plaintiff, but the symptoms persisted. We find Dr. Faludi testifying, as follows:
“A. Well, I think you have a very good point, because that was actually my puzzle in this case. This patient had, apparently, a rather severe injury to the, head, and people who have severe injuries to the head will sometimes have a hard time to find themselves after; and we classify that, then, sometimes, as a so-called post-cerebral concussion state. Well, there was one explanation. The other explanation, of course, was that this was a direct blow against the head which causes pressure against the neck, possibly a hyperextension motion of the head; and that is the type of injury, *347 together with the patient’s original complaints of arm numbness and pain, which will sometimes lead to herniated discs. And that is why I always kept in hack of my mind the possibility there: ‘Well, is it possible that this patient is just not getting along well on account of the remote possibility of having a herniated cervical disc?’ I will admit that this patient showed less signs, on examination, than the average person with a herniated cervical disc will show; and that is why I always did not really feel that he had one. Yet, occasionally, one will find a patient with relatively few signs and still has a herniated disc. I mean, that is the puzzlement in this case, really. I expected this patient to do better from every time I saw him. I tried to make him work; I pushed him hard, believe me. I was very strict with him, at times. I did not know, even, that there was litigation involved, in the beginning ; I did not see him for any litigation purposes. I wanted to get this patient well, together with Dr. Sauls, and yet this patient just would not make himself do things and said he would try it and couldn’t do it.”
Dr. Faludi last saw the plaintiff on December 15, 1959, which was only a few weeks before the date of his deposition on January 29, 1960, and at that time, Dr. Faludi was still not certain whether plaintiff had a ruptured cervical disc but he was definitely of the opinion that plaintiff could not return to heavy work. We find his testimony reading, as follows:
“A. * * * I felt that the patient was actually in condition to do light work and I felt that he ought to be reevaluated in a period of about three months for possible heavy work.
“Q. And that was — A. Now, of course, as you say, if the myelogram would have been performed, and should have shown a herniated disc, then appropriate measures should be taken.
“Q. Now, that is three months — you felt that that evaluation should be done in three months from December the 15th, 1959? A. That is correct, sir.
“Q. Now, when you say ‘light work’, are you speaking of something lighter than handling one hundred and fifty pound sticks of pulpwood as a means of livelihood? Did you feel, at any time during the time that you saw him, that he could actually handle pulpwood to the extent of being able to load a pulpwood truck? A. I didn’t think he would be able to, sir.”
Plaintiff was also seen by Dr. O. L. Sanders, a general practitioner of Converse, Louisiana. In his first examination on August 5, 1959, Dr. Sanders found pain on motion and tenderness in the cervical region and some limitation of motion in the cervical spine. He also found some muscle spasm in the left side of the neck. His diagnosis at the time was acute sprain of the cervical spine. The treatment prescribed by Dr. Sanders was medicine for pain and muscle relaxation. Dr. Sanders saw plaintiff six or seven times, the last occasion being on January 9, 1960. On the date of trial, plaintiff was still under the care and treatment of Dr. Sanders and it was definitely the opinion of Dr. Sanders that plaintiff was not able to return to work loading and hauling pulpwood.
Plaintiff was also seen on one occasion by Dr. Lloyd Murdock, an associate of Dr. Sauls in the Sabine Clinic and Hospital, at Zwolle. Dr. Murdock found high blood pressure and albumen in the kidneys, but both of those conditions were unassociated with the injury. From his examination of the plaintiff on April 3, 1959, it was Dr. Murdock’s opinion that plaintiff was not able to return to work but he based this opinion principally on the high blood pressure and albumen in the kidney.
Plaintiff was also examined on April 15, 1959, by Dr. R. E. Dupre of Ville Platte, Louisiana. He diagnosed traumatic neuritis of the right side of the head and was *348 of the opinion that plaintiff should be recovered in four to six weeks. Dr. Dupre saw plaintiff only on this one occasion.
As to the lay witnesses, Mr. Gordon Williams and Mr. Hamp Cook, both prominent merchants in Florie, Louisiana, testified that they had known plaintiff all of his life, that he had always been a good worker and they had never known of him being hurt before. Plaintiff’s wife, Doris Marie Allen, testified that plaintiff was always able to do hard physical labor before the accident but that since the injury he could not do any hard work and couldn’t even chop wood at home. Plaintiff’s brother, Elmo Allen, testified that since the date of the injury he had cut all of the stove wood for plaintiff because plaintiff was not able to do so. There is no evidence that plaintiff has done any hard physical labor since the date of the accident.
From the above brief review of the expert medical testimony, it is apparent that actually there is very little conflict in the testimony of the various doctors. Dr. Kop-finger and Dr. Sauls did testify that at the time they were seeing the plaintiff, which was during the early part of 19S9, they recommended that he try to go back to work, but they, both being general practitioners, stated that they would, of course, defer to the opinion of Dr. Faludi, who is a specialist in neurosurgery. Dr. Faludi and Dr. Sanders both testified that, in their opinion, plaintiff, as of the date of the trial of this case, was unable to return to the hard physical labor involved in loading and hauling pulpwood. Actually, the testimony of Dr. Murdock, as well as that of Dr. Du-pre, is not of very much assistance in this case.
In the instant case, the injury of which plaintiff complains admittedly falls within the field of the specialist in neurosurgery. As a rule of evidence, it is well settled in our jurisprudence that the testimony of a specialist as to matters which fall within his field is entitled to greater weight than that of a general practitioner. Rider v. R. P. Farnsworth Co., Inc., La.App., 61 So.2d 204; Harmon v. McDaniel, La.App., 41 So.2d 249; Jenkins v. Central Culvert Company, La.App., 33 So.2d 72.
Under this rule of evidence, the testimony of Dr. Faludi is, therefore, entitled to greater weight than the testimony of the remaining expert medical witnesses who were all general practitioners. Dr. Faludi’s opinion is corroborated by Dr. Sanders and is actually not seriously disputed by either Dr. Sauls or Dr. Kopfinger. The lay testimony, of course, is all in plaintiff’s favor. We, therefore, are of the opinion that the judge of the lower court was clearly correct in finding that the plaintiff had proved by a preponderance of the evidence that he was permanently and totally disabled.
Apparently the theme of defendant’s argument is that the doctors were never able to make a definite diagnosis as to. the exact cause of plaintiff’s symptoms. Our jurisprudence is clear that this is not necessary. In the very recent case of Johnson v. Atlantic & Gulf Stevedores, 102 So.2d 518, 520, the Orleans Court of Appeal held, as follows:
“Our over-all conclusion is that the plaintiff is not simulating the back pains he claims to suffer and there is pathology in his back which renders him unable to return to his job as longshoreman or to do work of any reasonable character. This condition is attributable to his accident and we believe he is a subject for compensation. Even if his injury is not a ruptured disc, still he should recover. The mere fact that a compensation claimant is unable to specifically identify or indicate the type of injury he has sustained does not preclude a recovery of compensation. The test is disability vel non and not the nature of the injury. Wallace v. Spohrer-Pollard Contractors, La.App., 76 So.2d 312; Dixon v. T. J. Moss Tie Co., La.App., 70 So.2d 763; Brown v. Joseph Rathbone Lumber Co., 11 La.App. 599, 123 So. 383.”
*349 There being no dispute as to remaining features of this case, it is our opinion that the judgment of the lower court should be affirmed. All costs of this appeal are assessed against the defendant.
Affirmed.