142 So.2d 594 (1962)
Adall HARRIS, Plaintiff and Appellant,
v.
GREAT AMERICAN INDEMNITY COMPANY et al., Defendant and Appellee.
No. 576.
Court of Appeal of Louisiana, Third Circuit.
June 13, 1962.
Rehearing Denied July 5, 1962.
*595 Gravel, Sheffield & Fuhrer, by James S. Gravel, Alexandria, for plaintiff-appellant.
Stafford & Pitts, by Grove Stafford, Jr., Alexandria, for defendant-appellee.
Before TATE, FRUGÉ and CULPEPPER, JJ.
CULPEPPER, Judge.
This is a workmen's compensation suit instituted by Adall Harris against his employer, Central Plumbing & Heating Company, and its insurer, Great American Indemnity Company, in which plaintiff alleges that he is totally and permanently disabled as a result of an accident which occurred on January 4, 1960. Plaintiff also prays for penalties and attorney's fees. After trial on the merits judgment was rendered in favor of plaintiff for the sum of $13.80 plus a penalty thereon at the rate of 12%, an attorney's fee of $98, and all costs of court including the fees of the expert medical witnesses. The amount of $13.80 represents the difference between the weekly rate of $33.80, paid plaintiff from January 4, 1960 through April 12, 1960, and the weekly rate of $35 to which plaintiff was entitled. From said judgment plaintiff has appealed. Defendant has answered the appeal, contending that it should not have been condemned to pay court costs, because before trial it had already paid to plaintiff all of the compensation benefits to which he was found entitled, except the sum of $13.80, which $13.80 was tendered to plaintiff at least ten days before the trial.
The record shows that on January 4, 1960, during the course of plaintiff's employment as a plumber's helper, he entered a large pipe or culvert, approximately five feet in diameter, for the purpose of performing work therein; in traversing the unlighted pipe, plaintiff stepped into a "drop-off" approximately two feet in depth, causing him to fall and strike his right side against the welded edge of the drop-off. Plaintiff, a 58 year old colored male, was immediately taken to Dr. H. A. McConnell, in Bunkie, Louisiana, who took x-rays and diagnosed a contusion of the right kidney and a fracture of the right 12th rib. On that same day plaintiff was transported to Cabrini Hospital in Alexandria, where he was attended by Dr. O. B. Owens, who diagnosed a contusion of the right kidney and fractures of the 11th and 12th ribs on the right *596 side. The ribs were in good alignment so no rib belt was applied to immobilize them. Dr. Owens stated that his principal concern was the contused kidney. After eight days in the hospital, during which time plaintiff was seen every day by Dr. Owens, he was released but subsequently seen by Dr. Owens on approximately ten office visits and finally discharged on April 12, 1960 as being able to return to his former employment as a plumber's helper. Dr. Owens testified positively that the x-rays taken by him during the period of his treatment showed callus formation bridging the fracture of both ribs and that the ribs healed normally, were in good alignment and sufficiently united for plaintiff to return to work. On receiving from Dr. Owens a report to this effect, the defendant insurer ceased making weekly compensation payments of $33.80 as of April 12, 1960.
Plaintiff then consulted his attorney, who arranged for an examination by Dr. Milton A. Honigman, a general practitioner. Dr. Honigman saw plaintiff on only two occasions, the first being July 18, 1960, at which time he diagnosed possible unhealed fractures of the lower right ribs. In order to confirm his diagnosis, Dr. Honigman ordered x-rays made by Dr. Aubrey M. Alexander, a specialist in radiology, attached to the staff of St. Francis Cabrini Hospital in Alexandria. Dr. Alexander could not find any rib fractures on the first x-rays taken July 19, 1960, but subsequent films taken on July, 21, 1960 were interpreted by Dr. Alexander as showing a "nonunion" of the fracture of the 12th rib, which condition, according to Dr. Alexander, would cause the fractured portion of the rib to be mobile and give pain on exertion. With this confirmation of his diagnosis, Dr. Honigman issued a report that as of July 18, 1960, plaintiff was still disabled.
Following receipt by defendant of a copy of Dr. Honigman's report, defendant had plaintiff examined by Dr. Daniel M. Kingsley, an orthopedic specialist. Dr. Kingsley saw plaintiff on September 26, 1960, and after a complete physical examination, including numerous x-rays, diagnosed that although plaintiff had extensive arthritis of the spine, unconnected with the accident, there was a good union and alignment of both rib fractures sufficient that this did not constitute a disabling condition. It was the opinion of Dr. Kingsley that plaintiff was able to return to his former employment.
During the month of January, 1961, shortly before the trial of this case on January 23, 1961, plaintiff was again examined by Dr. Owens and by Dr. Kingsley, both of whom took new x-rays and testified positively that there was a good union of the fractures of both ribs and that plaintiff was able to return to work. Plaintiff was also examined again in January of 1961 by Dr. Honigman who again ordered x-rays from Dr. Alexander, who in turn reported there was still a nonunion of the fracture of the 12th rib. Consequently, Dr. Honigman persisted in his opinion that plaintiff was still disabled. The principal difference between the opinions of these expert medical witnesses is as regards their interpretations of the x-rays. Dr. Alexander and Dr. Honigman testified that the "radiolucent line" at the fracture site meant there was no callus formation bridging the fracture and that therefore there was a "nonunion". Both Dr. Owens and Dr. Kingsley testified positively that the presence of such a "radiolucent line" did not mean there was a nonunion of the fracture. Both of the latter doctors stated positively that it is a very common occurrence for such a radiolucent line to remain visible for months or years after a fracture and that the presence of such a line did not mean that callus formation was not present within the bone or beneath the surface thereof. We are unable to reconcile this difference of opinion amongst the experts.
The trial court resolved the issue by adverting to the lay evidence, which shows that during September, October, November and December of 1960 plaintiff actually *597 performed hard physical labor in picking cotton on two plantations. When confronted with this fact during the trial plaintiff obviously misrepresented the facts by stating that he only picked "a little cotton", not over 60 or 70 pounds a day and couldn't even carry his own sack. The records kept by one of the plantations showed that he had worked a great number of days and picked a large amount of cotton. The employees of this plantation testified that plaintiff had carried his own sack. We agree completely with the following statement by the trial judge:
"The medical evidence in this case is quite contradictory and under the jurisprudence, the Court adverted to the lay testimony in order to resolve the contradiction in the medical testimony. On that score, the Court became convinced that the plaintiff failed to carry the burden which the law requires of him. That is; to prove by the preponderance of the evidence that he is in fact disabled from performing his usual work or the type of work that he was performing on the day of the accident. The plaintiff himself, by his testimony, has shown that he has proved himself unbelievable inasmuch as he testified that he had been unable to pick cotton except for just a little bit. However, on that score, the agent of one of the plantations for whom he picked cotton testified and corroborated his testimony with records, that the plaintiff had in fact worked 33 of 41 days during the cotton season and his record for picking cotton was about average, that is, anywhere from 148 pounds per day to 246 pounds per day. The testimony of the plaintiff does not support the claim for further compensation benefits. In other words, there is no evidence that would warrant this Court to condemn the defendant to pay compensation to the plaintiff beyond April 12, 1960, the date defendant ceased payment of compensation."
On appeal the plaintiff argues strongly that since the medical issue involved herein is one of interpretation of x-rays, the testimony of Dr. Alexander, a specialist in this field, should outweigh the testimony of the other medical experts. However, we note that even Dr. Alexander admitted there is a difference between an x-ray examination and a clinical examination. As Dr. Alexander put it, "there is a difference between treating the patient and treating the x-ray film." The x-ray is but a part of the overall clinical examination. In this case Dr. Kingsley, an orthopedic specialist, and Dr. Owens, the treating physician, based their opinions not only on x-rays, but on physical examinations of the plaintiff. Certainly their testimony must be given greater weight than that of a radiologist who only saw the x-rays and never examined the patient. Furthermore, the testimony of Dr. Kingsley and Dr. Owens must be assigned greater weight than that of Dr. Honigman, a general practitioner who saw plaintiff only twice. The jurisprudence is well settled that the testimony of a specialist in orthopedics as to an injury which falls within his field, is generally entitled to greater weight than that of a general practitioner. See Scott v. Roy O. Martin Lumber Company, La.App., 116 So.2d 726 and Ruffin v. Travelers, La.App., 120 So.2d 532. The rule is also well settled that the opinion of the treating physician who had the greater opportunity to examine and observe the patient is entitled to great weight. See Morris v. Supreme Bedding & Furniture Mfg. Co., La.App., 126 So.2d 412, and Istre v. Molbert Bros. Poultry & Egg Co., La.App., 125 So.2d 436.
Plaintiff urges that the attorney's fee of $98, awarded by the lower court, should be increased to at least the sum of $1500 in view of the legal services performed. Defendant concedes that it is liable to pay some amount as attorney's fees, because it admittedly failed to pay a sufficient weekly rate and actually did not *598 tender the deficiency until after this suit had been filed. (Darby v. Johnson, 118 So.2d 707 (1st Cir.App.1960) but argues that the fee of $98 is adequate in view of the small amount found due to plaintiff. In the recent case of Shuff v. Liberty Mutual Insurance Co., 134 So.2d 707 (3rd Cir.App.1961; writ of certiorari denied), involving a similar factual situation, this court held that an attorney's fee of $150 was adequate where judgment was rendered adverse to plaintiff on the principal issue, as to permanent and total disability, but was rendered in favor of plaintiff for the sum of $276.62, which the defendant insurer had arbitrarily failed to pay due to an error in computing the weekly compensation rate. See also Darby v. Johnson, supra, involving the same situation, where the court awarded $75 as attorney's fees for defendant's arbitrary refusal to pay a total of $272.75. Under these authorities it is our opinion that the fee of $98 awarded in the instant case was neither inadequate nor excessive.
By answer to the appeal, defendant contends that it should not be cast for costs of court, including the fees of the expert medical witnesses in the sum of $50 each, because ten days before the date of trial it tendered to the plaintiff the said sum of $13.80, which plaintiff refused to accept. Applicable here is LSA-C.C.P. Art. 1920 which reads as follows:
"Unless the judgment provides otherwise, costs shall be paid by the party cast, and may be taxed by a rule to show cause.
"Except as otherwise provided by law, the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable."
The Official Revision Comment found under LSA-C.C.P. Art. 1920 states that since the above article makes the imposition of costs discretionary with the court, the provision of the old Code of Practice, Art. 549, relating to avoidance of court costs by making real tender, is unnecessary. However, in determining the equities of the present case we deem it appropriate to consider Code of Practice, Art. 549, as well as Article 155 and the jurisprudence thereunder. Code of Practice, Article 155 provided in effect that if the defendant was cast he "shall pay the costs, unless he prove that, previous to the suit, he made a real offer of the amount actually due to the plaintiff, with interest and the costs which had accrued." In the instant case the tender of $13.80 made by defendant after suit was filed, but before the date of trial, did not include the court costs which had accrued nor did it include interest, although this amount was very small. Furthermore, the tender did not include any amount for penalties and attorney's fees to which plaintiff was unquestionably entitled by reason of defendant's arbitrary failure to pay the correct compensation rate. The situation is similar to that in which suit is filed on a note on which attorney's fees have accrued. In such a case, a real tender after the filing of suit must include not only the principal and interest due on the note, but the attorney's fees as well. Holmes Company v. Foret, 229 La. 360, 86 So.2d 66; 86 C.J.S. Tender § 8c, p. 564. It is therefore our opinion that the tender made in the instant case was insufficient because it did not include court costs which had accrued, nor did it include interest, penalties or attorney's fees. Accordingly, we do not consider it inequitable that defendant be cast for costs of court.
For the reasons assigned, the judgment appealed from is affirmed. All costs of this appeal are assessed against the plaintiff.
Affirmed.
On Application for Rehearing.
En Banc. Rehearing denied.