161 So.2d 361 (1964)
Willard NIXON, Plaintiff and Appellee,
v.
PITTSBURGH PLATE GLASS COMPANY (formerly Columbia-Southern Chemical Corporation), Defendant and Appellant.
No. 1069.
Court of Appeal of Louisiana, Third Circuit.
March 4, 1964.
Rehearings Denied March 17, 1964.
Writ Refused May 4, 1964.
*362 Plauché & Stockwell, by Oliver P. Stockwell, Lake Charles, for defendant-appellant.
Brumfield, Turner & Cooper, by Robert E. Turner, Baton Rouge, for plaintiff-appellee.
Before TATE, SAVOY and HOOD, JJ.
HOOD, Judge.
In this workmen's compensation suit plaintiff contends that he sustained injury to one of his fingers during the course of his employment, that in administering first aid treatment to him for that injury a nurse employed by defendant gave him a tetanus toxoid booster shot in his left arm, and that as the result of a reaction to or nerve damage caused by that shot plaintiff has been totally disabled since that time. The suit was instituted originally against plaintiff's employer, Columbia-Southern Chemical Corporation, but later because of a merger of that company with Pittsburgh Plate Glass Company, the latter was substituted as the proper defendant. After trial, judgment was rendered by the trial court in favor of plaintiff for maximum compensation benefits based on total and permanent disability, but denying plaintiff's demands for penalties and attorney's fees. Defendant has appealed, and plaintiff has answered the appeal demanding that the judgment be amended by allowing penalties and attorney's fees.
The evidence establishes that the tetanus shot was given to plaintiff in his left arm on September 28, 1960, that a few days later his arm began swelling, his left forearm became flexed toward his shoulder, his left wrist and fingers were flexed and his left thumb was adducted. Despite almost continuous treatment the arm became more rigidly fixed in this flexed position, the muscles became flabby, and atrophy set in. Finally, about 18 months after the injury, a gangrenous condition developed in the arm and on April 25, 1962, the arm was amputated about two or three inches below the elbow. Plaintiff still has some limitation of motion in his left shoulder.
Defendant concedes that plaintiff is now totally disabled, within the meaning of the Workmen's Compensation Act. It contends, however, that the trial court erred in finding (1) that plaintiff sustained a compensable injury during the course of his employment, and (2) that plaintiff received a nerve injury to his left arm as the result of the tetanus shot which was administered to him by defendant's employee.
Plaintiff, a 39-year-old negro man with a relatively low level of intelligence, had been employed by defendant as a common laborer for a period of about three years prior to the date of the alleged accident. On the morning of September 28, 1960, while performing duties during the course of his employment, he stuck a sharp object in the tip end of his right ring finger, causing a small puncture wound in that finger. About 12:20 p. m. that day he reported this injury to Miss Elthie Babineaux, a nurse employed by defendant at its First Aid Station, whereupon the nurse had him soak his hand in hot Epsom salts water and she also at that time gave him a tetanus toxoid booster shot in his left upper arm. On the following morning plaintiff again reported to defendant's First Aid Station complaining of soreness in his finger, and Miss Babineaux then referred him to Dr. Harold B. Lovejoy, a general practitioner retained by defendant as its company physician. Dr. Lovejoy, upon examining plaintiff, found an infection in the finger, and he thereupon incised it for the purpose of draining the infection and he advised plaintiff to soak his finger periodically *363 at home and at work. Plaintiff reported to Miss Babineaux again that afternoon for the purpose of soaking his finger, as he had been instructed to do.
On the next day, September 30, 1960, plaintiff again reported to Miss Babineaux at defendant's First Aid Station, complaining of pain, swelling and tightness in his upper left arm in the anticubital area. The nurse then contacted Dr. Lovejoy, and at his suggestion Miss Babineaux immediately took plaintiff in her automobile to plaintiff's own family physician, Dr. Morris G. Edelstien.
Dr. Edelstien noted the swelling in plaintiff's left elbow at the time of plaintiff's first visit to him on September 30, 1960, and for that condition he prescribed drugs, heat treatment and rest. Three days later, on October 3, 1960, Dr. Edelstien found that plaintiff's left forearm was flexed toward his shoulder, his left wrist and fingers were flexed and his left thumb was adducted. He treated plaintiff for about 12 days, during which time he determined that plaintiff was able to move the joints of his left arm in about an 80 percent range of motion while under hypnosis, although he was not able to move them when not under a hypnotic trance. He referred plaintiff to an orthopedic surgeon and to a psychiatrist for further examinations, and he finally concluded that as of the date of his last examination, on October 11, 1960, "this was probably a hysterical reaction" or a "conversion hysteria."
On October 17, 1960, plaintiff consulted Dr. Donald R. Vesley, a general practitioner, who treated plaintiff from that time until sometime in July, 1963. On the first examination Dr. Vesley found that plaintiff's left arm was numb, swollen and painful, and that he had difficulty in extending the fingers of his left hand, in raising his left wrist and in extending his left elbow. He concluded that the tetanus shot administered to plaintiff had been given directly into the radial nerve in the left upper arm, and he began treating plaintiff on the basis of that diagnosis. The treatment consisted of numerous exercises and physiotherapy, injections of enzyme medications to reduce swelling and to decrease systemic reactions, and the wearing of splints. In spite of this treatment, however, plaintiff's arm continued to get worse until finally a gangrenous condition developed and plaintiff's left arm had to be amputated on April 25, 1962.
Dr. Vesley testified that in his opinion plaintiff had received the tetanus shot directly into or very close to the radial nerve of his left arm, or in such a manner that it could get to that nerve, and that this shot caused the radial nerve in that arm to degenerate and eventually to die. He explained that:
"* * * The radial nerve supplies the muscles that extend the fingers, that extend the wrist and extend the elbow. When these muscles are paralyzed with this type of a flaccid paralysis, the opposing muscles will contract and cause the, especially the hand, to go into a position of extreme contraction. The hand is very subject to a disuse type of immobilization which may become permanent. * * *
* * * * * *
"Well, lacking any other history or any other explanation, I assume that the shot was given in such a manner that it injured the nerve and caused this result, * * *."
While being treated by the physicians hereinabove named, plaintiff also was examined by other medical experts. On October 4, 1960, he was examined by Dr. Edward W. Phillips, Jr., an orthopedic surgeon. Although Dr. Phillips noted that plaintiff was unable to move his left arm and that he experienced no sensation to pin pricks from the shoulder to the fingertips of that arm, he reported to Dr. Edelstien that he could find no orthopedic difficulties involving either the muscles or nerves in plaintiff's arm. Dr. Phillips examined plaintiff again on November 27, 1961, at which time *364 he found that the left arm was unquestionably atrophied and that plaintiff had some slight sensation to pin pricks from the left shoulder to the elbow, but no sensation from the elbow to the fingertips. He concluded that plaintiff was "definitely disabled," but that he still could find nothing from an orthopedic standpoint or of an organic nature to explain the disability.
Dr. Barclay Funk, a psychiatrist, examined plaintiff on October 14, 1960. He testified that "technically" he "made no diagnosis," because he could find no emotional disturbances or specific gains or conflicts upon which to base a diagnosis, but that his impression was that "if this was pursued further, the diagnosis of conversion reaction would probably be the diagnosis."
In November, 1960, Dr. M. E. Faulk, Jr., a neurosurgeon, hospitalized plaintiff and conducted numerous neuromuscular studies to determine the cause of his obvious disability. Dr. Faulk concluded that plaintiff was suffering primarily from a "severe hysteria," and secondly from "disuse atrophy." He did not feel that any neurological damage had occurred, although he noted that plaintiff had "persistent symptoms" of nerve damage without any specific findings thereof.
On December 23, 1960, Dr. Leonard K. Knapp, a general surgeon, examined plaintiff and found flexed muscles, marked atrophy and a stocking type loss of sensation in the entire arm, as found by other examiners. He concluded that plaintiff was "completely disabled from the atrophy and disuse" of the arm. In his opinion, however, plaintiff did not have an organic disease to account for his symptoms. His diagnosis was that plaintiff had functional disease or some type of hysterical reaction or the reaction of a malingerer.
Dr. Lovejoy, the employer's company doctor who had treated plaintiff the day after he injured his finger, examined plaintiff again on February 20, 1962, finding at that time that plaintiff had moderate atrophy in his left biceps and triceps muscles, that he had more atrophy in all of his forearm and hand muscles, that he had a glove-like anesthesia from his left fingertips to a point three inches above his left elbow, that although he had some reflexes in his left arm and wrist he lacked other reflexes, and that he was unable to move any of the fingers on his left hand even "by force." Since plaintiff had some reflexes in his left arm Dr. Lovejoy felt that the peripheral nerves were still intact. He testified that it was his "impression from talking with other doctors" that plaintiff had a conversion hysteria, and that the hysteria could have been precipitated by the tetanus shot, although it also could have been precipitated by many other things.
Finally, on August 16, 1963, plaintiff was examined by Dr. Giles R. Morin, a psychiatrist. Dr. Morin testified that he could find no gains or conflicts upon which a diagnosis of conversion hysteria associated with the arm could be based, and that plaintiff did not have any emotional disturbance at that time. He concedes, however, that this finding does not preclude the fact that plaintiff could have had an emotional disturbance sometime prior to the date of that examination.
On this evidence the trial judge concluded that plaintiff did receive a minor injury to his right ring finger while acting in the course of his employment, and that his present disability is "due to the medical complexities resulting from the nerve injury due to the shot administered after plaintiff received a very slight injury to his right hand."
In arguing that the trial court erred in finding that an accident occurred as contended by plaintiff, the defendant points out that none of plaintiff's fellow employees saw any such incident occur, and that although plaintiff now testifies that it occurred on September 28, 1960, he alleged in his petition and stated on other occasions that it occurred on other dates. Also, defendant calls our attention to the fact that *365 in giving a history of the injury to some of the examining physicians plaintiff informed some of them that a finger on his left hand, instead of the right, had been injured. It is pointed out that the testimony of a fellow employee indicates that plaintiff complained of numbness in his arm before he received the tetanus shot, and that no foreign substances were found in the wound when the infected finger was incised.
We do not think the inconsistencies in testimony or the items of proof pointed out by defendant are sufficient to overcome the evidence which tends to establish that plaintiff did sustain an injury to his finger on September 28, 1960. Since the injury was of a relatively minor nature and it healed quickly, we, like the trial judge, attach no significance to the fact that plaintiff later became confused or was mistaken as to the date it occurred or as to the finger which was injured. In our opinion the fact that no foreign substance was found in the infected area does not disprove plaintiff's statement that he stuck something in his finger. Although plaintiff's fellow employee testified that plaintiff complained of numbness in his arm before he got the shot, the employee was not present when plaintiff received the tetanus shot and we think a fair reading of his testimony justifies a conclusion that he misinterpreted plaintiff's statement as to when the shot had been received.
The evidence shows that when plaintiff reported the finger injury to the First Aid Station on September 28, 1960, he did have a "puncture wound," which was obvious to the nurse and apparently was serious enough to cause the nurse to feel that a tetanus shot should be given at that time, and to require an incision of the infected area the next day. And, the testimony of a fellow employee shows that plaintiff had been working with a material that day which could have caused such an injury and which plaintiff says did cause it. These facts tend to support plaintiff's testimony that such an injury was sustained, and accordingly, we find no error in the conclusion reached by the trial judge that plaintiff sustained an injury to his finger on September 28, 1960, as he says he did.
Defendant contends finally, however, that the plaintiff has failed to establish by a preponderance of the evidence that there is a causal connection between his present disability and the injury which he received during the course of his employment.
It is settled that a claimant in a compensation case, as in other suits, must establish with reasonable certainty, by a preponderance of the evidence, that he is disabled and that his disability results from accidental injuries sustained by him within the course and scope of his employment. See Bellard v. Liberty Mutual Insurance Company, La.App. 3 Cir., 150 So.2d 624, and cases cited therein.
A well established rule of evidence is that the testimony of specialists as to matters which fall within their fields is entitled to greater weight than that of general practitioners. Allen v. Coal Operators Casualty Company, La.App. 3 Cir., 124 So.2d 344; Rider v. R. P. Farnsworth Co., La.App. 2 Cir., 61 So.2d 204; Harmon v. McDaniel, La.App. 1 Cir., 41 So.2d 249; Jenkins v. Central Culvert Co., La.App. 2 Cir., 33 So.2d 72. Another equally well established rule is that the opinion of a treating physician who has been in close contact with his patient over a long period of time is entitled to greater weight than that of an equally qualified expert who has not had the benefit of close and frequent contact and examination. Vanderford v. Canal Insurance Company, La.App. 2 Cir., 120 So.2d 333; Crenshaw v. Firemen's Fund Indemnity Company, La.App. 2 Cir., 119 So.2d 663; McNulty v. Toye Bros. Yellow Cab Co., La.App. Orl., 73 So.2d 23; Trascher v. Eagle Indemnity Co. of New York, La.App. Orl., 48 So.2d 695; Vienne v. Chalona, La.App. Orl., 28 So.2d 154; and 100 C.J.S. Workmen's Compensation § 547(10), pp. 617-618. See also, Harris v. Great American *366 Indemnity Company, La.App. 3 Cir., 142 So.2d 594; and Thomas v. Fidelity & Casualty Company of New York, La. App. 4 Cir., 136 So.2d 824.
Summarizing the medical evidence in this case, we note that plaintiff was treated briefly by Dr. Lovejoy and by Dr. Edelstien, both general practitioners, and he then received extensive treatment over a period of more than two years by Dr. Vesley, also a general practitioner. In addition to the treating physicians, he was examined by a general surgeon, an orthopedic surgeon, a neurosurgeon and by two psychiatrists.
Although the principal treating physician, Dr. Vesley, feels that plaintiff sustained a nerve injury, the other two treating physicians, the general surgeon, the orthopedist and the neurosurgeon do not feel that there was such an injury. Some of these last-mentioned experts offer as an explanation of plaintiff's obvious disability that he suffers from some type of hysteria. Most of them concede, however, that such a diagnosis is out of their respective fields, and it is apparent that they arrived at such a diagnosis because it appears to be the only logical explanation of plaintiff's condition after they ruled out any organic disease or defect. Actually, a diagnosis of hysteria appears to fall specifically within the field of the psychiatrist, and yet the two psychiatrists who examined plaintiff failed to find any basis at all for a diagnosis of conversion hysteria. One of these psychiatrists examined plaintiff a few days after the accident occurred and the other examined him several months after the arm had been amputated.
The evidence shows clearly that prior to this accident plaintiff was able bodied and had had no trouble or disability referable to his left arm. Almost immediately after the tetanus shot was administered, his arm began swelling, the arm and hand became flexed, atrophy set in, and the arm continued to get worse until eventually it became necessary to amputate it. Plaintiff became disabled almost immediately after the date of the injury, and he has been disabled continuously since that time.
In Allen v. Coal Operators Casualty Company, supra, we quoted with approval the following rule from Johnson v. Atlantic & Gulf Stevedores, La.App. Orl., 102 So.2d 518:
"`* * * The mere fact that a compensation claimant is unable to specifically identify or indicate the type of injury he has sustained does not preclude a recovery of compensation. The test is disability vel non and not the nature of the injury. Wallace v. Spohrer-Pollard Contractors, La.App., 76 So.2d 312; Dixon v. T. J. Moss Tie Co., La.App., 70 So. 2d 763; Brown v. Joseph Rathbone Lumber Co., 11 La.App. 599, 123 So. 383.'"
In Wroten v. Woodley Petroleum Co., La.App. 2 Cir., 124 So. 542 (quoted with approval in Blanchard v. Travelers Insurance Company, La.App. 1 Cir., 121 So.2d 515), the court said:
"* * * when, * * * it is shown that the workman was in good health prior to the accident without any symptoms of the disease, and that he was immediately disabled by the accident in which he sustained wounds which could have caused the disease, and that the illness or pain immediately following the accident had been continuous, we think the presumption should be that the accident caused the disease, and that the workman is entitled to compensation for the resulting disability."
And, in Taylor v. Mansfield Hardwood Lumber Co., La.App. 2 Cir., 65 So.2d 360, the court said:
"It is only sufficient that plaintiff show that the accident during his employment caused an injury which contributed to the disability or hastened the progress of his disease, thereby shortening his life. It is not required *367 he prove the exact cause of his disability. (Citations omitted)."
Although no issue to that effect has been raised by defendant, we think it is appropriate to observe that generally the employer is liable for compensation benefits during the period of the claimant's disability, even though such disability was caused or prolonged by complications arising from the medical treatment which plaintiff was receiving for his compensable injury. See Calhoon v. Meridian Lumber Co., La.App. 2 Cir., 151 So. 778; Reed v. Calcasieu Paper Company, 233 La. 747, 98 So.2d 175. See also, Malone, Louisiana Workmen's Compensation Law and Practice, Sec. 233, pp. 286-287.
In the instant suit we do not consider it necessary to determine whether plaintiff did or did not sustain a nerve injury to his left arm. In our opinion the evidence is sufficient to establish a causal relationship between the injury which plaintiff sustained in the course of his employment and his present total disability, whatever the cause of that disability may be. Since the plaintiff was in good health prior to the accident, without any symptoms of disease or disability referable to his left arm, and since he experienced swelling, pain and disability immediately after the tetanus shot was administered and he has been disabled continuously subsequent to that time, we think the presumption is warranted that the shot administered to him in treating his minor injury caused his present disability. We find nothing in the evidence which tends to overcome that presumption.
Although the evidence may not show with certainty the specific cause of plaintiff's disability, it clearly establishes that he has been totally disabled continuously since the tetanus shot was administered to him on September 28, 1960. Under the circumstances presented here, and considering the presumption hereinabove mentioned, we think the trial judge correctly concluded that plaintiff's present total disability was caused or precipitated by the tetanus shot which was administered to him in the treatment of a minor injury which he sustained in the course of his employment. We accordingly find no error in the judgment of the trial court awarding plaintiff compensation benefits.
The only issue remaining is whether plaintiff is entitled to recover penalties and attorney's fees for the defendant's failure to pay workmen's compensation benefits. The trial court denied this portion of plaintiff's demands, assigning as its reason therefor that "this case presents a real medical problem which this Court feels that defendant had a right to have litigated to ascertain the applicability of the Workmen's Compensation Act."
Our review of the record indicates that prior to the institution of suit defendant received a report from Dr. Lovejoy to the effect that plaintiff was not disabled, and a report from Dr. Edelstien indicating that plaintiff's condition was not due to an injury which occurred on the job or to the tetanus shot which had been administered to him. In view of these reports and the apparent disagreement among the treating and examining physicians as to the cause of plaintiff's disability, we agree with the trial court that defendant was not unreasonable, arbitrary or capricious in refusing to pay plaintiff workmen's compensation benefits. In our opinion, the trial judge correctly rejected plaintiff's demands for penalties and attorney's fees.
For the reasons herein assigned, the judgment appealed from is affirmed. All costs of this appeal are assessed to defendant-appellant.
Affirmed.

On Application for Rehearing.
En Banc. Rehearing denied.